**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

In re:                                                    Case No. 17-21016-EEB

TERESA ESPINOZA, *Debtor*

_____

**RESPONSE OF PB FINANCING LLC TO DEBTOR'S OBJECTION TO**
**CLAIM NUMBER 7 FILED BY PB FINANCING LLC**

_____

PB Financing LLC ("PBF"), by and through its undersigned counsel, hereby responds to Debtor's Objection to Claim Number 7 Filed by PB Financing LLC (the "Objection"), and states as follows:

## I.   FACTUAL BACKGROUND

1.        On December 2, 2017 (the "Petition Date"), Teresa Espinoza ("Debtor") filed a voluntary petition for relief under Chapter 13 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Colorado.

2.        A Chapter 13 plan ("Plan")(Docket no. 52) was confirmed May 22, 2018.

**A.      The Relationship Between PBF and the Debtor**

3.        EAS Enterprises, Inc. d/b/a Executive Pawn ("Executive Pawn") was a licensed pawn shop and pawn broker operating at a brick and mortar location at 1110 S. Wadsworth Blvd., Lakewood, CO.

4.        At inception of the PBF relationship, Debtor and her family members were 25% owners of Executive Pawn. Apparently, Debtor subsequently became the 100% owner of Executive Pawn.

5.        Eric Espinoza, Debtor's spouse ("Espinoza") and family members Andrew Archuleta ("Archuleta") and Christina M. Mora ("Mora") were employed by Executive Pawn in

various capacities.

6.  On or about June 10, 2015, Executive Pawn, for good and sufficient consideration, made and delivered to PBF a Loan and Security Agreement ("Agreement") in order for Executive Pawn to borrow certain sums of money, from time to time, from PBF to fund Eligible Inventory and Eligible Pawn Receivables from its customers. A copy of the Agreement is attached hereto and incorporated herein by reference as **Exhibit "A."** The Agreement reflected a commercial transaction and not a consumer transaction.

7.  Contemporaneously, Executive Pawn, for good and valuable consideration, made and delivered to PBF a Revolving Credit Note ("Note") in the principal amount of $200,000.00. A copy of the Note is attached hereto and incorporated herein by reference as **Exhibit "B."**

8.  To secure repayment of the Note, the Agreement contained a grant of a first position security interest in substantially all assets of Executive Pawn ("Collateral").

9.  PBF's security interest in the Collateral was, and is, a perfected and first lien under the laws of the State of Colorado.

10.  As evidence of perfection, a UCC-1 Financing Statement, naming EAS Enterprises, Inc., was filed in the records of the Colorado Secretary of State on May 29, 2015, a true and correct copy of which is attached hereto and incorporated herein by reference as **Exhibit "C" and "D."** The financing statement covered, *inter alia*:

> All assets of the Debtor, whether presently existing or hereafter created or acquired, and wherever located, including but not limited to:
>
> (i) all of Debtor's accounts, accounts receivable, contract receivables, contract rights, notes, drafts, acceptances, instruments, chattel paper and general intangibles, and all guarantees and suretyship agreements relating thereto and all security for payment thereof, now and hereafter existing or arising;

(ii) all of the Debtor's inventory, including all goods, merchandise, raw materials, supplies and other tangible personal property, now owned or hereafter acquired, and all documents now and at any times covering or representing any of said property;

Debtor has agreed to not sell, factor or otherwise finance its accounts and to not grant any other security interest in its accounts or inventory. Public notice of this agreement is hereby given.

(all of which is hereafter called the "Collateral").

11.     As part of the credit transaction detailed above, Archuleta, Mora and Espinoza, for good and valuable consideration, made and delivered to Plaintiff PBF their personal Guaranty Agreements, true and correct copies of which are attached hereto and incorporated by reference as Exhibits **"E," "F" and "G,"** respectively.

12.     As part of the credit transaction detailed above, Debtor, for good and valuable consideration, made and delivered to Plaintiff PBF her personal Guaranty Agreement, a true and correct copy of which is attached hereto and incorporated by reference as Exhibits **"H."**

## B.     The Borrowing Base Covenant

13.     The Agreement was tied to maintenance of a certain level of value in both the pawned merchandise ("Pawn") and property for sale ("Inventory").

14.     Generally, the Agreement extended credit to Executive Pawn in accordance with the "Line of Credit Loan Base," which was defined in the Agreement at paragraph 1.18 as:

(a)     Fifty Percent (50%) of the aggregate Eligible Pawn Receivables; plus

(b)     Twenty Percent (20%) of the aggregate Eligible Inventory;

provided, however, that in no event shall the Line of Credit Loan Base be greater than the Maximum Commitment $200,000.00.

3

15.     The  Line of Credit Loan Base was required to be computed monthly with monthly reporting requirements by the Executive Pawn to PBF.

16.     However, the Line of Credit contained a limitation which the Agreement provided for at paragraph 2.1(c), as:

Line of Credit Limitation: Notwithstanding the loan commitment made in Section 2.1(b), at no time shall the aggregate of all Money Advances outstanding exceed the Line of Credit Loan Base.  Any Money Advances outstanding in excess of the Line of Credit Loan Base shall be immediately repaid to PBF by Borrower, without demand, notice or presentment and PBF may apply an Over Line of Credit Loan Base Fee of $35.

17.     On or about July 22, 2016, Executive Pawn and PBF agreed to an amendment of the Agreement ("Amendment").  A copy of the Amendment is attached hereto and incorporated herein by reference as **Exhibit "I."**

18.     The Amendment, *inter alia*, permitted an increased Line of Credit Loan Base up to Fifty Percent (50%) of the aggregate Eligible Inventory.

**C.     The Deterioration of the Borrowing Base**

19.     In April, 2017, the reported Eligible Pawn Receivables was approximately $158,000.00 and the reported Eligible Inventory was $90,000.00.  This totaled approximately $248,000.00.

20.     In April, 2017, the outstanding line of credit balance was approximately $167,000.00.  This translated to collateral coverage ratio of 1.49% or well below the 2.0% required coverage ratio under Amendment to the Agreement.

21.     For example, $248,000.00 of eligible assets would support a borrowing base of 50% or $124,000.00.  Conversely, $167,000.00 of borrowing would require eligible assets of

4

$334,000.00.

22.     The eligible assets significantly declined after April, 2017.

23.     In November, 2017, the reported Eligible Pawn Receivables was approximately $102,000.00 and the reported Eligible Inventory was $50,000.00.  This totaled approximately $152,000.00.

24.     In November, 2017, the outstanding line of credit balance was approximately $152,000.00.  This translated to collateral coverage ratio of 1.00% or well below the 2.0% required coverage ratio under Amendment to the Agreement.

25.     For example, $152,000.00 of eligible assets would support a borrowing base of 50% or $76,000.00.  Conversely, $152,000.00 of borrowing would require eligible assets of $304,000.00.

26.     Based upon these figures, it appeared that Executive Pawn was permitting the collateral base to deteriorate approximately 5% per month.

27.     Based upon these figures, it appeared to PBF that Executive Pawn was self-liquidating the collateral base in order to pay expenses and themselves and stay open.

28.     Based upon these figures, the business of Executive Pawn appeared to be a melting ice cube, which placed PBF at great risk of loss.

29.     On or about November 28, 2017, PBF provided notice, by certified mail, to Executive Pawn, Archuleta, Mora and Espinoza and made demand for the then full balance owed of $149,201.65.  True and correct copies of the Notice of Default are attached hereto, as **Exhibits "J," "K," "L"** and **"M"** and incorporated by reference.

5

30.     On or about November 28, 2017, PBF provided notice, by certified mail, to Debtor and made demand for the then full balance owed of $149,201.65.  A true and correct copy of the Notice of Default is attached hereto, as **Exhibit "N"** and incorporated by reference.

31.     PBF also emailed the Notices of Default to all of the email addresses utilized by Executive Pawn and the four individuals (including Debtor) during the course of the business relationship.   PBF requested an emergency meeting.   Debtor responded that they were unavailable.  A true and correct copy of the email string is attached as **Exhibit "O"** and incorporated by reference.

32.     The full balance was not paid and the account remained in default.

**D.     The Jefferson County Replevin**

33.     On December 13, 2017, PBF commenced a C.R.C.P. 104 action in 2017CV031968, Div. 9, Jefferson County District Court, Colorado (the "Replevin").  Named defendants were Executive Pawn, Archuleta, Mora and Espinoza.  Debtor was not named as a defendant due to the automatic stay under §362 of the Bankruptcy Code.

34.     PBF obtained a pre-hearing Order for Possession pursuant to C.R.C.P. 104(d) and a Show Cause Hearing was set for December 28, 2017.

35.     The Jefferson County Sheriff seized substantially all assets of Executive Pawn on December 21, 2017.

36.     On December 26, 2017, Executive Pawn, through Debtor, stipulated that judgment on the replevin claim should enter in favor of PBF and against Executive Pawn (the "Stipulated Judgment").  A true and correct copy of the Stipulated Judgment is attached as **Exhibit "P"** and incorporated by reference.

6

37.     On December 28, 2017, the Replevin court approved the Stipulated Judgment and further entered judgment for PBF and against Executive Pawn on the replevin claim.  The Show Cause Hearing was vacated.   A true and correct copy of the order is attached as **Exhibit "Q"** and incorporated by reference.   The various assets were then released by the Sheriff back to PBF for disposition.

**E.      The Commercially Reasonable Disposition of <u>Inventory</u>**

38.     A pawn shop can acquire inventory through several methods.  It can purchase outright from a customer.  Sometimes, an item previously pawned is not redeemed.  Such an item would become part of inventory.  The key feature is that inventory can be immediately sold by the pawn shop ("<u>Inventory</u>").

39.     Generally, a pawn shop will lend or purchase any item up to 50% of wholesale value of that specific item.  This formula will allow a pawn shop to resell an item at below retail price and still make a profit.  It is axiomatic that a keen eye for value is critical for a successful pawn shop operation.

40.     The final Inventory report generated by Executive Pawn is attached as **Exhibit "R"** and incorporated by reference.  Executive Pawn identified a cost basis of $35,428.98 in the Inventory and placed a market price for resale of $63,222.89 on the same property.

41.     PBF then retained Dickensheet & Associates to conduct a liquidation appraisal of the Inventory.   Dickensheet valued the Inventory at $18,284.20.  A true and correct copy of the Dickensheet Inventory Appraisal is attached as **Exhibit "S"** and incorporated by reference.

42.     PBF spoke with other Denver and Colorado Springs area pawn shop owners and inquired about bulk sales of the Inventory.  None were interested.  One pawn shop owner viewed

the Inventory and informed PBF he was concerned about 1) the poor quality of the property and 2) that the property was over valued on the books.

43.     PBF did locate a pawn shop in Indiana willing to purchase the Inventory.  An agreement was signed with a purchase price of $40,000.00.  A true and correct copy of the Inventory Purchase and Sale Agreement is attached as **Exhibit "T"** and incorporated by reference.

44.     PBF then sent out Article 9 notices of sale.   A true and correct copy of the Article 9 notice is attached as **Exhibit "U"** and incorporated by reference.

45.     The sale closed and PBF received the $40,000.00 proceeds.

46.     Shortly after delivery, the Indiana purchaser began to complain about 1) the poor quality of the Inventory and 2) the over valuation of the Inventory.  A true and correct copy of the email string with PBF is attached as **Exhibit "V"** and incorporated by reference.  The purchaser stated he would fire any of his employees that entered over valued transactions such as these.

47.     PBF submits the private sale of Inventory for $40,000.00 was commercially reasonable when compared to the Dickensheet liquidation appraisal of $18,284.20.

**F.     The Commercially Reasonable Disposition of <u>Pawn</u>**

48.     The management and disposition of Pawn is more complicated than Inventory.  A person (pawn debtor) transfers personal property to a pawn broker in exchange for a loan.  The pawn debtor has a certain amount of time to repay the loan and redeem the property.  Sometimes, a pawn debtor extends the time period by making periodic interest payments.  Eventually, if unredeemed, the pawned item becomes part of the pawn brokers inventory.

8

49.     The same general rule concerning inventory applies to pawn.  A pawn shop will lend or purchase any item up to 50% of wholesale value of that specific item.  This formula will allow a pawn shop to resell an item at below retail price and still make a profit.  It is axiomatic that a keen eye for value is critical for a successful pawn shop operation.

50.     The final Pawn report generated by Executive Pawn is attached as **Exhibit "W"** and incorporated by reference.  Executive Pawn identified a cost basis of $95,903.88 in the Pawn.  Stated otherwise, Executive Pawn loaned pawn debtors $95,903.88 for the Pawn.  Using the 50% wholesale rule, the Pawn should have had a wholesale value in the range of $191,807.76 ($95,903.88 x 2).  It did not.  The Pawn suffered the same over valuation problems as the Inventory.  Another Pawn issue raises even more eyebrows.

        *i-The Employee Pawn Transactions*

51.     Executive Pawn employees conducted pawn transactions with themselves reflected with a total cost book value of $21,555.00.  In other words, Executive Pawn employees received loans of $21,555.00 from the company in exchange for certain pledged property.  A true and correct copy of the Employee Pawn Report is attached as **Exhibit "X"** and incorporated by reference.  The employee Pawn is then 22% of the total Pawn ($21,555.00/$95,903.88).

52.     Accordingly, the wholesale value of the pawned property should have been approximately $43,110.00 ($21,555.00 x 2) using the 50% of wholesale rule.   It was not and it wasn't even close.

53.     Three examples illustrate the gross over valuation of Pawn transactions with employees.  PBF took three transactions from the Employee Pawn Report (Exhibit X) and compared the book cost per Executive Pawn against a second Dickensheet & Associates

9

appraisal.  The results are:

    A.    <u>Loan Number 0102684-1 (Exhibit X)</u>

| Customer | Description | Executive Pawn Cost | Appraised Value |
|---|---|---|---|
| Daniel Lopez | Xbox One 1540 | $1,210.00 | $150.00 |

PBF then did an internet search for "microsoft xbox one 1540" on google.  The result is attached as **Exhibit Y-1** and reveals retail prices for this merchandise ranging from $100.00 on eBay to $305.00 at Walmart.

    B.    <u>Loan Number 0105769-1 (Exhibit X)</u>

| Customer | Description | Executive Pawn Cost | Appraised Value |
|---|---|---|---|
| Daniel Lopez | Sanyo FW55D25F TV0 | $1,600.00 | $150.00 |

PBF then did an internet search for "Sanyo FW55D25F" on google.  The result is attached as **Exhibit Y-2** and reveals this TV can be purchased brand new today at Walmart for $382.78.

    C.    <u>Loan Number 0104479-1 (Exhibit X)</u>

| Customer | Description | Executive Pawn Cost | Appraised Value |
|---|---|---|---|
| Daniel Lopez | Apple MGA2LL/A Cellular Phone | $1,350.00 | $150.00 |

PBF then did an internet search for "Apple MGA2LL/A " and found the common name as iPhone 6.  A search for "apple iphone 6 cost" produced results attached as

**Exhibit Y-3**.  The new iphone retail prices range from $155.00 to $244.99.

54.     PBF offers no opinion on the accounting gymnastics conducted internally at Executive Pawn.  The most charitable characterization of these events is that Executive Pawn did not know how to run a pawn shop profitably.  Perhaps it simply loaned exorbitant sums of money on items worth a fraction of that cost.  Perhaps something else was going on.  Either way, resolution of any issue involving intent or value does not get the Court and Parties closer to resolving the instant claim objection.[1]

*ii-Attempt to Outsource Pawn*

55.     PBF had discussions with Denver area pawn shop "Pawn King" and inquired about outsourcing a portion of Pawn.  PBF even drafted a proposal for Pawn King, a true and correct copy of which is attached as **Exhibit "Z"** and incorporated by reference.  The deal failed to close as Pawn King's owner was concerned about 1) the poor quality of the property and 2) that the property was over valued on the books.  This was a recurring theme and PBF elected to service the Pawn in-house.

*iii-The Pawn Accounting as of May 31, 2018*

56.     Attached as **Exhibit "AA"** and incorporated by reference is a Redemption Report as of May 31, 2018.  This is a helpful document as it accounts for all redemptions to date; identifies remaining amounts to be collected, and reconciles with the Executive Pawn report (Exhibit W).

57.     PBF has collected a total of $23,886.04 in redeemed Pawn, Completed Layaway

---

[1] PBF has located numerous other accounting infirmities involving the over valuation of Pawn and Inventory and the instant examples are just a small sample.  The over valuation has created enormous problems in 1) selling the property and 2) preparing an accurate deficiency.

and Pawn-to-Inventory Sales.  This amount is slightly higher than Executive Pawn's book value

of $23,655.97.  PBF also received $12,245.28 in interest on Pawn.  The money has been placed in

a segregated account and the property returned to customers.  There ought not be any dispute

over this component.

58.     What does create debate are the "Remains to be Collected."  Executive Pawn book

values this property at $72,247.91.  PBF estimates the value at $42,127.90.  Once this property is

sold a final report can be generated.

   *iv-The Suggested Pathway Forward*

59.     PBF's initial proof of claim (no. 7) was based, in part, on estimates of property

value.  Different components have been in independent states of flux since the December, 2017

replevin.   The Inventory was sold outright.  Interest was collected on some Pawn and Layaway.

Some Pawn was redeemed.   Some Pawn remains and needs to become Inventory and sold.

60.     Throughout this procedure, PBF has gone the extra steps to extract the most value

from this property[2].  PBF intends to wrap up and close all online sales of unredeemed Pawn by

June 30, 2018.  All remaining Pawn will then be sent to Dickensheet & Associates for placement

in the appropriate auction, probably in July.  At that point, PBF can generate final reports and

amend its proof of claim to reflect the final unsecured deficiency.

61.     Such a procedure would benefit both the Court and Debtor.  PBF has supplied a

small percentage of the existing reports and factual background concerning the liquidation of

---

[2] The easiest and fastest way to liquidate everything would have been via Dickensheet auction.  This would have resulted in a final deficiency months ago and a straightforward unsecured proof of claim.  It also would have resulted in a substantially higher deficiency absent PBF's continued involvement.

Executive Pawn assets.  Bringing finality to the liquidation would allow Debtor to bring a more

focused objection, if any, to amended proof of claim.  The Court would have hard numbers as to

the disposition and avoid trying to determine a deficiency based on values.

62.     PBF admits that portions of its proof of claim rely on valuation as opposed to hard

numbers.  That doesn't invalidate the claim, but it may impact prima facie validity and burden of

proof going forward.  This valuation portion is steadily decreasing and all valuation estimates

should be eliminated by July 31, 2018, or the anticipated Dickensheet auction of the remainder of

property.

> Following the bar date, amendment is permitted to cure an obvious defect,
> describe the claim with greater specificity or plead a new theory of recovery on
> facts set out in the original proof. Post-bar date amendments, however, will be
> scrutinized to ensure that the amendment is not making a new claim against the
> estate.
>
> In determining whether amendment will be allowed, most courts apply a "nexus"
> test, which focuses on the connection between the original claim and the
> amendment.
>
> 9 Collier on Bankruptcy P 3001.04 (16th 2018).

63.     In this case, an inherent defect exists in the form of hundreds of pieces of pawn

shop property that required liquidation under different sets of rules (i.e., one set of rules for

Inventory and another set of rules for Pawn).  A fire sale would have resulted in a quicker

resolution, but at the expense of higher return.[3]  By the same token, greater specificity is required

as to the exactness of the deficiency, as opposed to litigants arguing about value.  See, e.g., In re

Norris Grain Co., 131 B.R. 747, 749-750 (M.D. Fla. 1990), aff'd 969 F.2d 1047 (11th Cir. 1992).

---

[3]  Debtor is paying a 100% Plan.  It is in Debtor's best interest that the deficiency be as
low as possible.

13

64.     The Objection raises two small points requiring comment.  First, that Notice was not sent to Debtor personally (Objection, ¶6).  Debtor did receive notice and a copy is attached hereto as Exhibit N.  Second, the Objection claims the Debtor is not personally liable (Objection, p. 3, ¶1).  Debtor is personally liable and a signed copy of her guaranty is attached hereto as Exhibit H.  PBF attached the Replevin Complaint and exhibits to its proof of claim, but Debtor's documents were not part of that filing.  Schedule E/F, at ¶4.9, scheduled PBF's debt at $149,202.00, and not subject to offset, dispute or contingency.  PBF did not believe further documentation was necessary.

CONCLUSION

PBF holds a valid, timely filed claim.  PBF respectfully suggests the Court permit an amended proof of claim be filed after all remaining property is liquidated over the next 6 weeks.  Such a procedure would greatly narrow the issues; promoting judicial economy for the Court and Parties.

Dated: June 15, 2018                    Respectfully submitted,

**DOUGLAS D. KOKTAVY, P.C.**

by: /s/ Douglas D. Koktavy
Douglas D. Koktavy, #14641
Building B, Suite 120
10200 East Girard Avenue
Denver, Colorado 80231
Telephone: (303) 758-6601
Facsimile:  (303) 758-6540
E-mail: Doug@ColoradoCreditorLaw.com

**ATTORNEY FOR CREDITOR**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 15, 2018, a true and correct copy of the foregoing **RESPONSE OF PB FINANCING LLC TO DEBTOR'S OBJECTION TO  CLAIM NUMBER 7 FILED BY PB FINANCING, LLC** was placed in the United States mail, postage prepaid, addressed to:

| | | |
|---|---|---|
| Teresa Espinoza<br>176 Winona Court<br>Denver, CO 80219 | Jane M. Roberson*<br>720 S. Colorado Blvd.<br>Ste., 630-S<br>Denver, CO 80246 | |
| Douglas B. Kiel*<br>Chapter 13 Trustee<br>4725 S. Monaco St.<br>Ste. 120<br>Denver, CO 80237 | US Trustee*<br>Byron G. Rogers Federal Building<br>1961 Stout St.<br>Ste. 12-200<br>Denver, CO 80294 | |

\* by CM/ECF per L.B.R. 5005-4 only.

/s/ Douglas D.  Koktavy

15